**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 29, 2001**

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v

No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

---

BEFORE THE ENTIRE BENCH

TAYLOR, J.

The issue here is whether 2000 Public Act 381 is exempt from the power of referendum of the Michigan Constitution. Having granted leave to appeal and heard oral argument, this Court finds as follows:

(1) The power of referendum of the Michigan Constitution "does not extend to acts making appropriations for state institutions . . . ." Const 1963, art 2, § 9.

(2) 2000 PA 381 states that "one million dollars is appropriated from the general fund to the department of state police . . . ." MCL 28.425w(1).

(3) An appropriation of $1,000,000 is an "appropriation," and the Department of State Police is a "state institution."

(4) Therefore, the power of referendum of the Michigan Constitution does not extend to 2000 PA 381.

Accordingly, consistent with Const 1963, art 2, § 9 and an unbroken line of decisions of this Court interpreting that provision,[1] the Court of Appeals is reversed, and the relief sought in the complaint for mandamus is granted. The May 21, 2001 declaration by the Board of State Canvassers of the sufficiency of the petition for referendum on 2000 PA 381 is vacated and defendant Secretary of State and the Board of State Canvassers are directed that 2000 PA 381 is not subject to referendum for the reasons set forth herein.

Pursuant to MCR 7.317(C)(4), the clerk is directed to issue the judgment order in this case forthwith.

CORRIGAN, C.J., and YOUNG, and MARKMAN, JJ., concurred with

---

[1] *Co Rd Ass'n v Bd of State Canvassers*, 407 Mich 101; 282 NW2d 774 (1979)*; Co Rd Comm'rs v Bd of State Canvassers*, 391 Mich 666; 218 NW2d 144 (1974)*; Good Roads Federation v State Bd of Canvassers*, 333 Mich 352; 53 NW2d 481 (1952)*; Moreton v Secretary of State*, 240 Mich 584; 216 NW 450 (1927); *Detroit Automobile Club v Secretary of State*, 230 Mich 623; 203 NW 529 (1925).

2

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                                  No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

_____

CORRIGAN, C.J. (*concurring*).

I concur in the result and reasoning of the majority opinion. I write to emphasize that the intervening defendant retains a direct remedy, the initiative process. Under our state constitution, this remedy is available even when the Legislature has made an appropriation to a state institution.

I also wish to emphasize that the Legislature's subjective motivation for making a $1,000,000 appropriation in 2000 PA 381—assuming one can be accurately identified[1]—is

_____

[1] The parties and amicus curiae have asserted
(continued...)

irrelevant.  Intervening defendant contends that despite the appropriation in 2000 PA 381 and the plain language of Const 1963, art 2, § 9, the act is subject to the referendum process because the "purpose" of the appropriation, as purportedly revealed by the legislative history, was to evade a referendum.  This argument is misplaced.  This Court has repeatedly held that courts must not be concerned with the alleged motives of a legislative body in enacting a law, but only with the end result—the actual language of the legislation.  See *Kuhn v Dep't of Treasury*, 384 Mich 378, 383-384; 183 NW2d 796 (1971); C F *Smith Co v Fitzgerald*, 270 Mich 659, 681; 259 NW 352 (1935); *People v Gibbs*, 186 Mich 127, 134-135; 152 NW 1053 (1915).

Our cases follow Justice Cooley's powerful exposition of this doctrine in his seminal work on constitutional law.  It is as persuasive to us as it was to our predecessors:

> The validity of legislation can never be made to depend on the motives which have secured its adoption, whether these be public or personal, honest or corrupt.  There is ample reason for this in the fact that the people have set no authority over the legislators with jurisdiction to inquire into their conduct, and to judge what have been their purposes in the pretended discharge of the legislative trust.  This is a jurisdiction which they have reserved to themselves exclusively, and they have appointed frequent elections as the occasions and the means for bringing these agents

---

[1](...continued)
contradictory positions regarding the legislative motive for the appropriation in 2000 PA 381.  It is a dubious proposition to suggest that a legislative body comprised of individual persons can have a single motivation for enacting any piece of legislation.  Even assuming that such a motive could be ascertained, there is no testimonial record in this original action.  Accordingly, we have no means by which to decide these disputed claims regarding legislative motivation.

2

to account. A further reason is, that to make legislation depend upon motives would render all statute law uncertain, and the rule which should allow it could not logically stop short of permitting a similar inquiry into the motives of those who passed judgment. Therefore the courts do not permit a question of improper legislative motives to be raised, but they will in every instance assume that the motives were public and befitting the station. They will also assume that the legislature had before it any evidence necessary to enable it to take the action it did take. [Cooley, Constitutional Law, pp 154-155.]

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                                                              No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

_____

YOUNG, J. (*concurring*).

I join and fully concur in the admirably concise majority opinion. I write separately to provide the rationale and analysis for my conclusion that 2000 PA 381 is exempt from the referendum power of art 2, § 9 of our 1963 state constitution and why I take exception to the constitutional exegesis offered by my dissenting colleagues.

I.  THE QUESTION BEFORE THE COURT

There is no gainsaying that 2000 PA 381 has become the focus of a heated debate among various segments of Michigan's citizens; Justice Cavanagh's dissent is generous in providing his own extensive personal views on the public controversy surrounding 2000 PA 381. However important, this political issue-the merits or demerits of the underlying act-is *not* before this Court. The sole question we are to decide in this case is a legal one: Is 2000 PA 381 subject to the referral process under the provisions of art 2, § 9? If it is, 2000 PA 381 will not become effective until the next general election-if a majority of the voters then approve it. Const 1963, art 2, § 9; MCL 168.477(2). If the stated limitation on the people's referral power contained in art 2, § 9 applies, the act is not subject to the referendum process at all.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In December 2000, the Legislature enacted 2000 PA 381, MCL 28.421 *et seq.*, which modifies the standards for the issuance of concealed weapons permits. The effective date of the law is July 1, 2001.

Intervening defendant is a group that filed with defendants Secretary of State and Board of State Canvassers a petition, signed by approximately 260,000 Michigan voters,[1]

---

[1]According to a letter written by Christopher Thomas, Director of Elections for the Department of State, an effective referendum petition requires 151,136 valid signatures (comprising five percent of voters in the last gubernatorial election). Approximately 260,000 signatures appear on the petition filed by defendants. Once the Board of Elections has declared the sufficiency of a referendum petition, the effectiveness of the law that is the subject of
(continued...)

2

requesting a referendum on the new law. Although the Board of Canvassers initially, by a two-to-two vote, declined to certify the petition on the basis that the law may not be subject to referendum, on May 21, 2001, the board certified the petition. Approximately 230,000 valid signatures supported the petition (80,000 more than the number required).[2]

On March 23, 2001, plaintiffs-two organizations that lobbied for the law and three individuals who want to apply for concealed weapons permits-filed a complaint for mandamus in the Court of Appeals, seeking to prevent the Board of State Canvassers from proceeding with the canvass of the petitions. Plaintiffs argued that 2000 PA 381 is not subject to referendum because it contains an appropriation to a state institution, the Department of State Police, and the Michigan Constitution provides that "[t]he power of referendum does not extend to acts making appropriations for state institutions . . . ." Const 1963, art 2, § 9.

As stated, plaintiffs contended that two provisions in 2000 PA 381 make appropriations for a state institution within

[1](...continued)
the petition is suspended until a vote at the next general election, November 2002 in this case. Const 1963, art 2, § 9; MCL 168.477(2).

[2]On May 16, 2001, intervening defendant filed its own mandamus action, asking the Court of Appeals to require the Board of Canvassers to certify the petition. However, the Court of Appeals opinion in the instant case was issued on the same day, just before the filing of intervening defendant's complaint. After the Board of Canvassers met for a second time and voted to certify the petition, the parties informed the Court of Appeals that the second mandamus action was moot.

3

the meaning of art 9, § 2. The first, § 5v of the act, (1) creates a concealed weapon enforcement fund in the state treasury, (2) allows the state treasurer to receive money or other assets from any source for deposit into the fund and to direct the investment of the fund, (3) provides that money in the fund at the close of the fiscal year shall remain in the fund and not lapse to the general fund, and (4) directs the Department of State Police to expend money from the enforcement fund only to provide training to law enforcement personnel in connection with the act.[3] The second, § 5w(1) of the act, provides that "[o]ne million dollars is appropriated from the general fund to the department of state police for the fiscal year ending September 30, 2001" for such activities as distributing free safety devices to the public and creating and maintaining a database of individuals applying for a concealed weapons license.[4]

---

[3]MCL 28.425v.

[4]MCL 28.425w(1) provides:

One million dollars is appropriated from the general fund to the department of state police for the fiscal year ending September 30, 2001 for all of the following:

(a) Distributing trigger locks or other safety devices for firearms to the public free of charge.

(b) Providing concealed pistol application kits to county sheriffs, local police agencies, and county clerks for distribution under section 5.

(c) The fingerprint analysis and comparison reports required under section 5b(11).

(d) Photographs required under section 5c.

(continued...)

Plaintiffs further argued that defendants Secretary of State and the Board of Canvassers had a threshold duty to determine whether the petition on its face meets the constitutional prerequisites for acceptance and canvassing, and that, until this determination was made, canvassing should cease.

In an order dated April 9, 2001, the Court of Appeals granted People Who Care About Kids permission to intervene and accepted the amicus curiae brief of the Michigan Association of Chiefs of Police. The panel then dismissed plaintiffs' complaint for mandamus, holding-on a ground not raised by the parties-that

> the matter is not ripe for this Court's consideration. The Board of State Canvassers has not completed its canvass of the referendum petitions. MCL 168.479.[5]

---

[4](...continued)
(e) Creating and maintaining the database required under section 5e.

(f) Creating and maintaining a database of firearms that have been reported lost or stolen. . . .

(g) Grants to county concealed weapon licensing boards for expenditure only to implement this act.

(h) Training under section 5v(4).

(i) Creating and distributing the reporting forms required under section 5m.

(j) A public safety campaign regarding the requirements of this act.

[5]MCL 168.479 provides:

[a]ny person or persons, feeling themselves aggrieved by any determination made by said board, may have such determination reviewed by mandamus, certiorari, or other appropriate remedy in the
**(continued...)**

5

On plaintiffs' application for leave to appeal, this Court remanded the matter to the Court of Appeals for plenary consideration of the complaint for mandamus.[6]  463 Mich 1007-1008 (2001).

On remand, the Court of Appeals denied plaintiffs' request for mandamus, holding that "2000 PA 381 is not an act making appropriations for state institutions as contemplated by Const 1963, art 2, § 9," and that it therefore was subject to referendum.  246 Mich App ___; ___ NW2d ___ (2001).

We granted plaintiffs' application for leave to appeal from the decision of the Court of Appeals.  464 Mich ___ (2001).[7]

III.  CONTROLLING RULES OF CONSTITUTIONAL CONSTRUCTION

Of preeminent importance in addressing the matter at hand is an understanding of the particularized rules of textual construction that apply to constitutional provisions.  "Each

_____

[5](...continued)
supreme court.

[6]**We stated in our remand order that**

[t]his controversy is ripe for review because it is not dependent upon the Board of Canvassers' counting or consideration of the petitions but rather involves a threshold determination whether the petitions on their face meet the constitutional prerequisites for acceptance. . . .  All of the information necessary to resolve this controversy, i.e., whether 2000 PA 381 constitutes a law which is excepted from the referendum process under Const 1963, art 2, § 9, is presently available.

[7]We indicated in our grant order that the only issue for our consideration was "whether 2000 PA 381 is an act making an appropriation for a state institution for the purposes of Const 1963, art 2, § 9."

6

provision of a State Constitution is the direct word of the people of the State, not that of the scriveners thereof," *Lockwood v Nims*, 357 Mich 517, 565; 98 NW2d 753 (1959) (BLACK, J., concurring), and therefore "[w]e must never forget that it is a Constitution we are expounding," *id.*, quoting *McCulloch v Maryland*, 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819).

Our primary goal in construing a constitutional provision–in marked contrast to a statute or other texts–is to give effect to the *intent of the people* of the state of Michigan who ratified the constitution, by applying the rule of "common understanding." Recently, in *People v Bulger*, 462 Mich 495, 507; 614 NW2d 103 (2000), we explained the rule of common understanding:

> In construing our constitution, this Court's object is to give effect to the intent of the people adopting it. . . . "Hence, the primary source for ascertaining its meaning is *to examine its plain meaning as understood by its ratifiers* at the time of its adoption." [Citations omitted; emphasis supplied.]

I agree with Justice Cavanagh's reliance on Justice COOLEY's explanation of the rule of "common understanding":

> A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people*, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding*, and ratified the instrument in the belief that that was the sense designed to be conveyed." *[Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75, 85; 594 NW2d 491 (1999), quoting 1 Cooley, Constitutional Limitations (6th ed), p 81 (emphasis

7

added).]

See also *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000); *Highway Comm v Vanderkloot,* 392 Mich 159, 179; 220 NW2d 416 (1974); *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971); *Michigan Farm Bureau v Secretary of State,* 379 Mich 387, 391; 151 NW2d 797 (1967); *Lockwood*, *supra* at 569.

As expounded by Justice Cooley and this Court, the "common understanding" principle of construction is essentially a search for the original meaning attributed to the words of the constitution by those who ratified it. This rule of construction acknowledges the possibility that a provision of the constitution may rationally bear multiple meanings, but the rule is concerned with ascertaining and giving effect only to the construction, consistent with the language, that the ratifiers intended. Thus, our task is not to impose on the constitutional text at issue here the meaning we as judges would prefer, or even the meaning the people of Michigan today would prefer, but to search for contextual clues about what meaning the people who ratified the text *in 1963* gave to it.

Our analysis, of course, must begin with an examination of the precise language used in art 2, § 9 of our 1963 Constitution. See *American Axle, supra* at 362. Art 2, § 9 provides, in relevant part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. *The power of referendum does not*

8

*extend to acts making appropriations for state institutions or to meet deficiencies in state funds* and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election. [Emphasis supplied.]

As is apparent from the text of art 2, § 9, the people's right of referral is expressly limited. The limitation relevant here is the first: There is no right of referral for "acts making appropriations for state institutions." There is no dispute here that the Department of State Police is a "state institution" within the meaning of art 2, § 9. Nor is there any dispute that 2000 PA 381 "allocated" one million dollars of public funds to the state police for responsibilities that the act requires the state police to perform. The contested issue is whether the million-dollar allocation made in 2000 PA 381 constitutes an "appropriation" within the meaning of art 2, § 9.

IV. APPLICATION

A. WAS THE COMMON UNDERSTANDING OF THE ARTICLE 2, SECTION 9 LIMITATION ON THE RIGHT OF REFERRAL AT THE TIME OF RATIFICATION DIFFERENT FROM THE PLAIN MEANING OF THE LANGUAGE?

The majority construes the language of art 2, § 9 in a plain and natural manner. Thus, it concludes that 2000 PA 381 is an act making an appropriation to a state institution and

9

is thus exempt from the referral power. To read the limiting language of art 2, § 9 in any other manner would incorporate into that constitutional provision a meaning that is not apparent on its face. Accordingly, unless we are able to determine that this provision had some other particularized meaning in the collective mind of the 1963 electorate, we must give the effect to the natural meaning of the language used in the constitution.

Justice Cavanagh asserts that the common understanding of art 2, § 9 is different from the plain meaning given to this constitutional provision by the majority. Those who suggest that the meaning to be given a provision of our constitution varies from a natural reading of the constitutional text bear the burden of providing the evidence that the ratifiers subscribed to such an alternative construction. Otherwise, the constitution becomes no more than a Rorschach[8] exercise in which judges project and impose their personal views of what the constitution *should have said.*[9]

---

[8]A Rorschach test is a personality and intelligence test that requires a subject to "interpret" inkblots. Webster's New Collegiate Dictionary, 1977, p 1006.

[9]The difference between my approach and that of the dissents is that I believe I have an obligation to establish from available historical evidence whether the "common understanding" diverged from the plain meaning of the language in the constitution. Because the dissents offer no such proofs, and presumably believe them to be unnecessary, it appears that the dissents believe that they can "intuit" the common understanding they prefer. Given their intuited conclusion about the people's understanding, the dissents ignore the art 2, § 9 limitation on the power of referral. Justice Cavanagh's dissent concludes that the limitation, if given effect, could not have been intended by the people because it causes a "constitutional invalidity." Slip op p 9.
(continued...)

10

Interestingly, no one–not the dissents, the parties, or even the amici curiae–has attempted to provide a scintilla of historically based evidence that provides support for the belief that in 1963 the people of this state understood the limiting language of art 2, § 9 to mean something other than what it naturally and plainly says. The reason for this omission is simple: There is not much historical background on the provision to report in the first instance. Moreover, that which exists fails to demonstrate that the people attributed a meaning other than the construction the majority gives to art 2, § 9.

Within the limited time constraints occasioned by the exigencies of having to decide this case by the July 1, 2001, effective date of 2000 PA 381, we have searched for evidence that the common understanding is that proposed by Justice Cavanagh. We have found no such historical evidence in the record of the constitutional convention, at the time of our constitution's ratification, or in contemporaneous news articles that provide support for the dissent's asserted "special" common understanding of art 2, § 9.

Indeed, one might expect that the framers of our 1963 Constitution–the participants of the constitutional convention that drafted the constitutional text that was eventually ratified–would have provided some gloss on or construction of

---

⁹(...continued)
This is pure tautological reasoning. A constitutional provision that contains its own limitation cannot be "invalidated" when one gives the limitation its natural import.

the intended meaning of the art 2, § 9 limitation on the right of referral.  In point of fact, the framers provided none.

Surprisingly, during the entire constitutional convention, excepting references to the convention's successive procedural approvals of the provision at issue, the framers never discussed the substance of art 2, § 9.[10] Especially important, nothing in the convention record has any bearing on what the framers, much less the public, "commonly understood" about the limitation on the referral power created by the constitutional language selected–"acts making appropriations for state institutions."

Particularly noteworthy in this regard is the "Address to the People" accompanying Const 1963, art 2, § 9.  The address, officially approved by the members of the constitutional convention, provides the text of each provision of the proposed constitution the people ratified in 1963 and a commentary, written in simple language, explaining the import of each provision and any changes the proposed constitution made to comparable provision of the 1908 constitution.  That address was widely distributed to the public before the ratification vote.[11]  The address was intended as a vehicle to

---

[10]See 1 Official Record, Constitutional Convention 1961, p 758; 2 Official Record, Constitutional Convention 1961, pp 2390-2392, 2418, 2779, 2927-2928,

[11]**Because** the "Address to the People," or "Convention Comments," constitutes an authoritative description of what the framers thought the proposed constitution provided, this document is a valuable tool in determining whether a possible "common understanding" diverges from the plain meaning of the actual words of our constitution.  See *Regents of the Univ of*
**(continued...)**

educate the public about the proposed constitution.

Significantly, in the "Address to the People" accompanying Const 1963, art 2, § 9, the framers advise the people that this provision constitutes only a "revision" of Const 1908, art 5, § 1, and that the revision "eliminat[es] much language of a purely statutory character." 2 Official Record, p 3367. The address also notes that the revision "specifically reserves the initiative and referendum powers to the people [and] *limits them* as noted . . . ."[12] *Id.* (emphasis added). There is no further reference to the art 2, § 9 "limits" on the power of referral or any explanation regarding how those limitations were expected to function in practice.

Thus, the 1963 constitutional record provides no basis for concluding that the people were led to believe (or actually entertained the notion) that the art 2, § 9 limitation on the right of referral–"acts making appropriations for state institutions"–meant or was intended to mean anything other than what it plainly says. Similarly,

---

[11](...continued)
*Mich v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975) ("[t]he reliability of the 'Address to the People' . . . lies in the fact that it was approved by the general convention . . . as an explanation of the proposed constitution. The 'Address' also was widely disseminated prior to adoption of the constitution by vote of the people").

[12]Equally of interest is the actual language of the two limitations of art 2, § 9 on the power of referral. The first precludes referrals concerning "acts making appropriations to state institutions" while the second precludes referrals concerning acts addressing "deficiencies in state funds." Other than the meaning suggested by the words of the clause itself, we have no greater understanding of what the framers, much less the people, understood the second limitation to mean than we do of the first.

13

I have been unable to locate (and no one has provided to the Court) any contemporaneous news articles or other documents circulated in the public domain that suggest that the public in 1963 had a specific or "common" understanding of art 2, § 9 that diverged from the natural and plain meaning of its text.[13]

The absence of any evidence from the 1963 constitutional convention record or other contemporaneous articles in the public domain suggesting support for some kind of special "common understanding" about art 2, § 9 consistent with the dissents' view (or any other) ought to be conclusive. In the absence of evidence on this point, this Court should accord the language in question its natural, plain meaning.

### B. JUSTICE CAVANAGH'S ASSERTED "COMMON UNDERSTANDING" THAT "APPROPRIATIONS" MEANS "GENERAL APPROPRIATIONS" IS ALSO AT VARIANCE WITH THE STRUCTURE OF THE CONSTITUTION

---

[13]While in 1963 the question of government by plebiscite–direct action by the citizens through initiative and referendum as opposed to indirect action through their elected representatives–was a commonplace fact of American political life, in 1913, this was still a startlingly radical proposition and one rarely embodied in state constitutions of the era. In 1913, only a dozen or so states recognized a popular right of referendum and initiative. *Detroit Free Press,* March 22, 1913.

The public record concerning the 1913 amendment that incorporated the precursor of art 2, § 9 into the 1908 constitution also fails to establish that the people then understood the "acts making appropriations" limitation to mean something other than what the language plainly suggests. We have been unable to locate from any source the actual 1913 amendment ballot language approved. Neither the *Detroit Free Press* nor *The Detroit News Tribune* did more than respectively advocate the rejection or adoption of the amendment. See, e.g., *Detroit Free Press*, March 22, 1913; *The Detroit News Tribune*, March 18, 1913. We have found no historical basis even for a "vicarious" common understanding of the kind asserted by Justice Cavanagh grounded in the ratification of the 1913 amendment.

Lacking any evidence that the citizens believed they were ratifying a provision that meant something quite different from that of the plain language of art 2, § 9, Justice Cavanagh nevertheless *presumes* that this must have been the case. He is able to so conclude because he is convinced that the natural construction the majority gives to art 2, § 9 produces an "absurd result":[14]

> I am confident that the constitutional right of referendum, in this narrow context, should not be taken away by so transparent an artifice. Justice Cooley's "great mass of the people" would, if asked, surely suppose that "acts making appropriations for state institutions," which deny the people's reserved power of referendum, are general appropriations bills containing substantial grants to state agencies. Those grants would have to ensure the viability of the agencies, or, as the Court of Appeals put it, support the agencies' "core functions." 246 Mich App ___; ___ NW2d ___ (2001). The people of Michigan, I am certain, never intended to authorize the 2000 lame duck Legislature's legerdemain. [Slip op at 9.][15]

I believe that Justice Cavanagh's presumption is unfounded because (1) it is not grounded in an assessment of what the voters *in 1963* understood art 2, § 9 to mean, and (2) it does not give sufficient weight or meaning to the expressly stated competing language and values embodied in our constitution or the differences between the power of initiative and referral.

---

[14]In a different context in which this Court was construing a statute, we rejected the "absurd result" mode of construction. *People v McIntire*, 461 Mich 147, 155-160; 599 NW2d 102 (1999).

[15]Justice Cavanagh also suggests that acts making grants that "ensure the viability of [state] agencies" or grants that "support the agencies' 'core' functions" would also preclude a referendum. Of course, Const 1963, art 2, § 9 contains no textual support for either of the two tests.

15

In this regard, it is important to consider the relationship between the constitutional power accorded to the Legislature, Const 1963, art 4, § 1, and the specific means chosen in the initiative and referendum provisions that check the power of the Legislature.[16]  Without question, art 4, § 1 gives the Legislature plenary power to enact laws for the benefit of Michigan citizens.  Equally clearly, art 2, § 9 provides a means for citizens directly to challenge Legislative action or inaction.  I believe that it is a matter of constitutional significance that the *initiative* power contains no limitation (save procedural requirements such as those concerning when the initiative process can be commenced and the number of people who must support it), but that the *referendum* power is expressly limited by two substantive restrictions–an exception  to the power of referral for acts "making appropriations for state institutions," and an exception for those acts enacted to "meet deficiencies in state funds."[17]

Stated otherwise (leaving aside momentarily the question

---

[16]"The legislative power of the State of Michigan is vested in a senate and a house of representatives."  Const 1963, art 4, § 1.

[17]As noted, the current provision carries forward the language of Const 1908, art 5, § 1, that the referendum power does not extend to "acts making appropriations for state institutions and to meet deficiencies in state funds."  Art 2, § 9 uses the disjunctive "or" between the two categories of nonreferable items, as opposed to the conjunctive "and" in the art 5, § 1 version of the provision in the 1908 constitution. We need not speculate about the possible meaning of this word change, because our only concern in this matter is with respect to the first limitation category.

of what the people understood in 1963 the art 2, § 9 term "appropriations" meant), it appears unchallenged that "acts making appropriations" are *always* subject to nullification by initiative, but such acts are *exempted* from the referral power. Because exercise of both the referral and initiative powers may result in the nullification of a law enacted by the Legislature, one may well ask: Why, when the people enacted two provisions that are clearly intended as checks on the constitutional power of the Legislature, would the people substantially limit their power of referral, but not their power of initiative? Based upon the structure of these provisions, the answer appears obvious that the people feared more the circumstance of preventing acts involving "appropriations" from becoming law (the referral power) than they feared a nullification vote on the very same bill *after* it became effective. Otherwise they would not have imposed an exception to their power of referral.

Justice Cavanagh asserts that the "appropriations" limitation on the people's referral power could only have been intended to mean "general appropriations bills containing substantial grants to state agencies." Slip op at 9. I question why that conclusion is justified, particularly given that even the dissent notes the framers' drafting precision concerning matters involving the *general budget*. See slip op, pp 7-8. I wholeheartedly agree with Justice Cavanagh that the framers intended to improve and increase legislative accountability for legislative *general budgeting* processes and were very precise in their draftsmanship to accomplish this

17

goal.  See, e.g., Const 1963, art 4, § 31 (general appropriation bills, priority, statement of estimated revenue).[18]  Justice Cavanagh assumes, without providing support, that the people believed that only general appropriation acts were referenced in art 2, § 9.

Concerning art 4, § 31, in the Address to the People the framers advised:

> This is a new section designed to accomplish two major purposes:
>
> 1.    To focus legislative attention on the general appropriation bill or bills to the exclusion of any other appropriation bills, except those supplementing appropriations for the current year's operation.
>
> 2.    To require the legislature (as well as the governor by a subsequent provision) to set forth by major item its own best estimates of revenue.
>
> The legislature frequently differs from executive estimates of revenue.  It is proper to require that such differences as exist be specifically set forth for public understanding and future judgment as to the validity of each. [2 Official Record, p 3375.]

---

[18]Const 1963, art 4, § 31 provides:

The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year's operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill.  One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed.

Thus, the people were specifically advised in 1963 that the focus of this provision was to ensure accountability for the making of the entire state budget. A reciprocal provision applicable to the Governor, art 5, § 18,[19] was also added in 1963. These were entirely new provisions added to the 1963 constitution whereas the language of art 2, § 9 was carried forward from the 1913 amendment to the 1908 constitution. The 1908 constitution had no provisions comparable to art 4, § 31 and art 5, § 18.

The point is that, contrary to Justice Cavanagh's suggestion, none of these *general budget* provisions added in 1963 were connected by the framers to the older language of art 2, § 9. More important for our purpose of discerning whether there was a "special" common understanding of art 2, § 9 as the dissent supposes, it is noteworthy that *the framers*

---

[19]Const 1963, art 5, § 18 provides:

> The governor shall submit to the legislature at a time fixed by law, a budget for the ensuing fiscal period setting forth in detail, for all operating funds, the proposed expenditures and estimated revenue of the state. Proposed expenditures from any fund shall not exceed the estimated revenue thereof. On the same date, the governor shall submit to the legislature general appropriation bills to embody the proposed expenditures and any necessary bill or bills to provide new or additional revenues to meet proposed expenditures. The amount of any surplus created or deficit incurred in any fund during the last preceding fiscal period shall be entered as an item in the budget and in one of the appropriation bills. The governor may submit amendments to appropriation bills to be offered in either house during consideration of the bill by that house, and shall submit bills to meet deficiencies in current appropriations.

*clearly never communicated to the people* that the new general budget provisions had any bearing on other legislative acts, such as 2000 PA 381, that merely made an appropriation of public funds to a state institution.  In short, the general budget provisions of the 1963 constitution do not appear to be related to other kinds of bills that simply "appropriate" for purposes other than the general budget process.[20]

Most important to my conclusion that Justice Cavanagh is simply wrong in supposing that art 2, § 9 refers to *general appropriation bills* is the fact that art 4, § 31 provides a definition of "appropriation bill,"[21] and only this category of bills is tied to the annual budget process.  Thus, had the framers intended that the art 2, § 9 "appropriations" limitation on the right of referral mean "a general appropriations bill" as urged by the dissent, then I believe that the framers would have done two things that they clearly did not do.  First, I think the framers would have used in art 2, § 9 the art 4, § 31 definition of "appropriation bill." Second, I believe the framers would have advised the public in the Address to the People of the relationship between the newly added general budget provisions (including the

_____

[20]The constitution also explicitly recognizes a nonbudgetary form of appropriation acts, those that appropriate public money for local or private purposes.  See art 4, § 30.  The point is, the constitution does not purport, as intimated by the dissent, to limit or define legislation that makes an appropriation as only those acts that concern general appropriations.

[21]"Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill."  Art 4, § 31.

20

definition of appropriation bill) and the older language of art 2, § 9 limiting the power of referendum.

When it is so apparent throughout the 1963 constitution that the framers sought to clarify the budget-related appropriations process, I think that the above-noted omissions underscore that the kind of "appropriations" referenced in art 2, § 9 have nothing to do with those referenced in art 4. Further, there is no evidence of which we are aware that in 1963 the people had a contrary "common understanding."

Moreover, greater assurance that there was no "common understanding" contrary to the plain language of art 2, § 9 is derived from the controversy that culminated in this Court's split decision in *Todd v Hull*, 288 Mich 521; 285 NW 46 (1939). In *Todd*, this Court was called upon to determine whether 1939 PA 3[22] was properly given immediate effect pursuant to Const 1908, art 5, § 21,[23] notwithstanding that, by giving the act

---

[22]**1939 PA 3** abolished the Michigan Public Utilities Commission, created the Michigan Public Service Commission, and appropriated $10,000 from the general fund for the purpose of setting up the MPSC.

[23]That provision of our 1908 constitution–which contained language identical to that appearing in the 1908 version of art 2, § 9–provided that

> the legislature may give immediate effect to *acts making appropriations* and acts immediately necessary for the preservation of the public peace, health or safety . . . . [Const 1908, art 5, § 21 (emphasis supplied).]

Compare this "immediate effect" provision language with that of Const 1908, art 5, § 1 (the predecessor to Const 1963, art 2, § 9):

> [T]he people reserve to themselves the
> **(continued...)**

immediate effect, the Legislature had encroached upon Const 1908, art 5, § 1 (the precursor of Const 1963, art 2, § 9. Four members of the *Todd* Court agreed, with little explanation, with the plaintiffs' assertion that 1939 PA 3 was not in the category of "acts making appropriations" within the meaning of art 5, § 21.  However, four other justices observed that

> [t]here is no question but that the act makes an appropriation.  An act making an appropriation as used in the Constitution is a legislative act which sets apart or assigns to a particular purpose or use a sum of money out of what may be in the treasury of the State for a specific purpose and objects,–an act authorizing the expenditure of public funds for a public purpose. [*Todd* at 531.]

Regarding the referral question, these four justices additionally opined that

> [t]he claim that plaintiffs are entitled to a referendum is effectually disposed of by the language of the Constitution itself because if the legislature had a right to give the act in question immediate effect, then it negatived the idea of a referendum. [*Todd, supra* at 535.]

The significance of *Todd* is not that it conclusively

---

[23](...continued)
power to . . . approve or reject at the polls any act passed by the legislature, except acts making appropriations for state institutions and to meet deficiencies in state funds.

* * *

The second power reserved to the people is the referendum.  No act passed by the legislature shall go into effect until 90 days after the final adjournment of the session of the legislature which passed such act, except such *acts making appropriations and such acts immediately necessary for the preservation of the public peace, health or safety*, as have been given immediate effect by action of the legislature.  [Emphasis supplied.]

22

construed the same language at issue in this case. The fact is, *Todd*–a split decision–has no precedential value. *Todd* is nevertheless highly relevant because it involves a claim, similar to the one made here, that the Legislature's inclusion of an appropriation in 1939 PA 3 was a "mere subterfuge," *Todd* at 531, to place it within the category of acts that could be given immediate effect and thus be immune to referendum.

*Todd* demonstrates that the people were aware in 1963 that the Legislature had exercised what it believed to be its appropriation prerogative in such a fashion as to diminish the people's right of referral. Notwithstanding, the people did not seek to change the constitutional referral language to preclude the Legislature from capriciously exercising its power of appropriation.

V. CONCLUSION

Determining the people's "common understanding" of a relatively obscure constitutional provision ratified nearly forty years ago is admittedly a challenging deductive enterprise–one that must be grounded in the available evidence. Above all, it is not a psychic exercise. On the basis of the evidence we have independently sought, I conclude that there is no reliable evidence that the people commonly understood anything other than what art 2, § 9 plainly says: that the people's power of referral is precluded concerning any act that makes an appropriation for a state institution. Accordingly, 2000 PA 381 falls within the category of "acts making appropriations for state institutions" and is thus not

23

amenable to the people's right of referral under art 2, § 9.

The majority's decision today will undoubtedly disappoint those who passionately believe that 2000 PA 381 represents bad public policy. While it will be of no consolation, it bears restating that the serious underlying political question is *not* before the Court.

In the current charged political environment, the dissent makes an emotionally appealing argument: Why not just let the people decide? Simply answered, the people's ability to decide by the referendum process is not infinite; rather, it is circumscribed by the limitations placed in the Michigan Constitution. While perhaps less satisfying to those who oppose 2000 PA 381, our answer is that the people are still free to directly challenge the propriety of the legislation by initiative. Const 1963, art 2, § 9; MCL 168.471, 168.472. Additionally, if the people believe that the Legislature has abused its powers by capriciously precluding their power of referral, the traditional means of voter sanction remain recall and the ballot box. However, the limitations imposed in art 2, § 9 on the people's right of referral preclude that they do so by means of referendum.

Finally, while it may be attractive to some, I believe that the dissenter's approach is not only at odds with the constitution, but destroys the Legislature's direct accountability to the people for its acts by interposing the judiciary as an arbiter of essentially political questions that are fundamentally legislative in character. Consider Justice Cavanagh's tests of what he believes constitutes

24

"appropriations" that do preclude referrals under art 2, § 9: (1) grants that "ensure the viability of [state] agencies"; or (2) grants that "support the agencies' 'core functions." (Slip op p 9.) Exactly how large an "appropriation" constitutes one sufficient to ensure the "viability" of a state agency or, for that matter, its "core function"? What *is* a state agency's "core" function, what constitutes its "viability," and who gets to decide these questions–the Board of Canvassers, the Secretary of State, the courts? The dissenters are eager to have the courts decide these questions. Perhaps there are members of the public who believe that the courts are competent to address these issues. I submit that these are Delphic questions that neither a judge nor the judicial system itself is best equipped to answer. More to the point, the tests the dissenters urge to assess whether an act making an appropriation is nonetheless amenable to referral *despite* the express constitutional limitation are simply ones made up from whole cloth and which have no basis in the text of our constitution. The judiciary is not authorized to create ways of evading the terms of our constitution; nor should the courts manufacture tests that amount to no more than providing a means of promoting sitting judges' personal preferences to accomplish such goals. Neither is a judicial function, and the public should never be confused on this issue. Our courts must refrain from engaging in such endeavors because they are beyond our constitutional authority and competence.

# STATE OF MICHIGAN

## SUPREME COURT

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                                 No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

---

MARKMAN, J. (*concurring*).

The issue before this Court is whether it will act as a court of law and read the constitution in accord with its plain language, or whether it will effect what many, perhaps even most, in this state view as a "good" thing. The majority opinion, in which I fully join, sets forth its analysis simply and straightforwardly. It does so because the constitutional issue before us is simple and straightforward. I offer this

concurrence only to emphasize the extremely important points of disagreement between the majority opinion, and the opinions of the Court of Appeals and my dissenting colleagues.

I. COURT OF APPEALS

Concerning the opinion of the Court of Appeals in this matter, I offer the following thoughts:

(1) The Michigan Constitution excepts from the referendum process "acts making appropriations for state institutions." It may well have been preferable for the constitution instead to have excepted from the referendum process: (a) merely acts that are necessary in order for the state to "exercise its various functions free from financial embarrassment"; (b) merely acts appropriating monies without which state agencies "would cease to function," or without which their "continued existence" would be in jeopardy; or (c) merely acts that pertain to the "core functions," or that are not "peripheral to the core purpose," of state agencies.[1] However, the constitution did none of these. Rather, it excepted from the referendum process "acts making appropriations for state institutions." In reading into the constitution these

_____

[1] The Court of Appeals asserts that these alternative formulations, each of which it has incorporated in its opinion, were set forth by this Court in *Detroit Auto Club v Secretary of State*, 230 Mich 623; 203 NW 529 (1925), in the course of our interpreting the predecessor version of the current Michigan Constitution. However, such language, to the extent that it can be discerned at all in *Detroit Auto Club*, was set forth in the altogether different context of determining whether the state highway department was or was not a "state institution." It was not done in the context of determining whether an enactment of the Legislature was an "act[] making appropriations." Furthermore, this Court in 1925, as in 2001, could not alter the language of the constitution, and it did not purport to do so.

2

alternative limitations upon the referendum process, the Court of Appeals has, without warrant, substituted its own judgment concerning how the constitution *ought* to read in place of the judgment of those who actually proposed and ratified the constitution.

(2) In particular, the Court of Appeals has, without warrant, substituted its own judgment for that of "We, the people of the State of Michigan" who "have ordain[ed] and established] *this* constitution."[2] "This" constitution is one that, for better or worse, excepts from the referendum process "acts making appropriations for state institutions." It is not one that excepts from the referendum process a greater or a lesser range of legislative acts, depending upon the personal preferences of individual judges or the political imperatives of the moment.

(3) In a truly remarkable statement, the Court of Appeals asserts:

> [E]ven if we were to conclude that the statutory expenditures constituted appropriations for state institutions as contemplated by [the constitution], we would nevertheless hold that the overarching right of the people to their 'direct legislative voice' . . . requires that 2000 PA 381 be subject to referendum.

I would respectfully suggest that the "overarching right of the people" is to have the constitution that they have ratified given respect and accorded its proper meaning. The fundamental flaw in the Court of Appeals statement is evident in its very assertion. Who is to say, for example, that this

---

[2] Const 1963, Preamble (emphasis added).

3

particular "overarching right," "the right to a direct legislative voice," is *more* "overarching" than the right of the people to have the legislative judgment of their elected representatives given effect over the objections of five percent of the electorate?  In truth, in a system of constitutional government, we examine the language of the constitution itself to determine which rights are "overarching."  Whether the referendum process or the legislative judgment should prevail in a particular case does not depend upon which right or which value is perceived to be more "overarching" by a judge, but rather upon which result is required by the terms of the constitution itself.  There is, in fact, an "overarching right" to a referendum, but only in accordance with the standards of the constitution; otherwise, there is an "overarching right" to have public policy determined by a majority of the people's democratically elected representatives.

(4) It is hard to imagine a single statement more fundamentally at odds with the *genuinely* "overarching right" of the people to responsible constitutional government than that of the Court of Appeals.  I repeat it, for it evidences a profound misunderstanding about the proper role of the judiciary that demands response:

> [E]ven if we were to conclude that the statutory expenditures constituted appropriations for state institutions as contemplated by [the constitution], we would nevertheless hold that the overarching right of the people to their 'direct legislative voice' . . . requires that 2000 PA 381 be subject to referendum.

What this apparently means is that, "[e]ven if we were to

4

conclude" that the constitution stated one thing, the Court of Appeals panel would *still* abide by its own views in holding that the constitution meant a different thing. Thus, it could be that "[e]ven if we were to conclude" that the constitution prohibited prior restraints on the press, we would "nevertheless hold" that the "overarching right" of persons to a fair trial requires that newspapers not write irresponsibly about high-profile criminal cases. Or it could be that, "[e]ven if we were to conclude" that the constitution prohibited denying criminal defendants a right to a jury trial, we would "nevertheless hold" that the "overarching right" of judicial efficiency requires that exceptions sometimes be made to this requirement. In other words, no matter what the actual language of the constitution, the Court of Appeals panel will, in effect, create a "higher" constitutional law whose requirements will supersede those of the constitution ratified by "we, the people." This is not law; it is a prescription for judicial domination.

## II. JUSTICE CAVANAGH'S DISSENT

Concerning the dissent of Justice Cavanagh in this matter, I offer the following thoughts:

(1) In addition to the various standards fashioned by the Court of Appeals in replacing those set forth by the Michigan Constitution, the dissent adds the standard of "great public significance." Apparently, the greater the "public significance" of a law, the more essential it is that a referendum be allowed to proceed, notwithstanding the language of the constitution. For what it is worth, I am in complete

5

agreement that 2000 PA 381 is a matter of "great public significance" and can easily appreciate why its opponents wish to make it the subject of a referendum. Nevertheless, it can be assumed that any measure that becomes the focus of a serious referendum effort will be a matter of "great public significance" and, in any event, the constitution does not make distinctions between those legislative enactments that some justices may view as of "great public significance" and those that are viewed as of lesser significance.

(2) Equally irrelevant to this Court's constitutional analysis are the dissent's various references to the "lame-duck" character of the Legislature[3]; the fact that "firearms advocates and persons interested in hunting" are "pitted" against a "coalition of law enforcement, religious, and educational interest"; and the fact that some individual members of the Legislature view their colleagues as having improper motives in attaching an appropriations provision to 2000 PA 381.

(3) The dissent chastises the majority for having "neglected to recite" certain facts in its opinion. With all due respect, the majority has done no such thing. It has merely neglected to "recite" facts that are wholly irrelevant to its legal analysis, as is typically the case in our

---

[3] The dissent describes the majority as "granting the lame-duck legislative majority the prize it apparently sought . . . ." However, as the dissent well appreciates, judges are not in the business of "granting prizes" to either side of a controversy; rather, they are in the business of interpreting the language of the law and letting the chips fall where they may.

6

opinions. The majority, for example, views it as irrelevant for purposes of its legal analysis that the law under consideration is of "great public significance," or, in particular, that the law relates to a highly divisive political controversy. Rather, the constitution means exactly the same thing whether the law at issue pertains to firearms, to farming irrigation, or to any other conceivable subject matter. Therefore, reciting the details or the political or legislative history of the statute before us, beyond identifying the appropriations that it makes, would add nothing to the constitutional analysis. Furthermore, contrary to what would have been the case if the dissent's position had prevailed, "future litigants," concerning whom the dissent expresses such concern, will henceforth be apprised of the unvarying meaning of the constitution, and will not be required to count noses about how many justices view the law at issue in *their* future case as being of "great public significance," or whether the appropriations made in *their* future case involve a "core function" or are essential to the "continued existence" of some state agency.

(4) The dissent describes the majority's constitutional analysis as one that "focuses narrowly on the superficially straightforward question," as being "legalistic," as being "pinched," and as being "overly literal." Such descriptions are typical of those uttered when a judge is frustrated in his ability to reach a particular result by the actual language of the law. Contrary to the dissent, the majority does not interpret the constitution "literally" or "legalistically."

7

There is simply no reasonable alternative interpretation to the words "acts making appropriations for state institutions." Again, it may well be that the dissent's formulation of the right of referendum is preferable to that of the constitution. However, such a determination is not for this Court to make- no matter how "publically significant" a law. As Chief Justice Marshall recognized in *Marbury v Madison*, nearly two centuries ago, it is the responsibility of the judiciary to say what the law "is," not what it believes that it "ought" to be.[4]

(5) The dissent's reference to Justice Cooley's rules of constitutional interpretation is apt, but misses the point. Constitutional interpretation varies from statutory interpretation principally because constitutional language tends to be more concise, and to relate to broader expressions of principle, than does statutory language. The language of constitutions, therefore, also tends to be more susceptible to multiple interpretations than does the more precise and more thorough language of statutes. Justice Cooley's rules make clear how, in a constitutional context, broad language and general words are to be given reasonable meaning. When, however, constitutional language *is* straightforward, such as the eligibility requirements for a member of Congress,[5] or the

---

[4] *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

[5] *Powell v McCormack*, 395 US 486; 89 S Ct 1944; 23 L Ed 2d 491 (1969).

8

procedural requirements of the legislative process,[6] we accord such language its plain and ordinary meaning.  "[R]easonable minds, the great mass of the people themselves" tend to accord words such plain and ordinary meanings.  Contrary to the dissent, Justice Cooley did not assert, in effect, that "apple" can mean "orange," if a group of citizens could be found who understood it in this sense.  Rather, what he asserted was that *ambiguous* terms, those fairly susceptible to multiple understandings, should be assessed by his rules.  The "common understanding" of most words is that they possess their plain and ordinary meanings.[7]

(6) It should be noted that the dissent does not ultimately rest its interpretation upon any specific language or phrase contained in the constitution, since it cannot do so.  Instead, it relies upon such amorphous concepts as "the

---

[6] *Clinton v New York City*, 524 US 417; 118 S Ct 2091; 141 L Ed 2d 393 (1998).

[7] The dissent's "generous" reading of the constitution is only "generous" if one starts with the point of view that a referendum should proceed on the law in controversy.  If, on the other hand, one wishes to have the law take normal effect, without awaiting the next general election, then perhaps the dissent's reading might be characterized by some as somewhat less "generous."  Although, in my judgment, the constitution should be interpreted "faithfully," rather than "generously" or "non-generously," it is difficult for me to understand how *any* interpretation can be drawn from the language of the referendum clause, no matter how "generous," that leads to the conclusion reached by the dissent.  It is unclear whether the dissent believes that the majority has misconstrued "acts" or "making" or "appropriations" or "for" or "state" or "institutions," or how such words have been misconstrued.  In other words, exactly which interpretation of which word by the majority is most "dark" or most "abstruse," in the dissent's judgment?

overall approach" to legislation taken by the constitution's framers and the people who ratified it.  But, rather than taking the framers and ratifiers of the constitution at face value and assuming that they intended what they plainly wrote, the dissent manages creatively to conclude that the framers and ratifiers meant something other than what they wrote.  On what basis does it reach such a conclusion?  Does the dissent identify convincing statements in support of that proposition by the framers?  Does the dissent point to evidence that "we, the People" were misled into believing that "acts" or "appropriations" really did not mean "acts" or "appropriations?"  Does the dissent offer new historical information that the ratifiers understood that *Detroit Auto Club,* and other earlier decisions of this Court, were being reversed by the Constitution of 1963?  No, there is no argument of this kind.[8]  All that we are left with is that the dissent believes that the drafters of the constitution, and "We, the People" who ratified it, *should have* adopted the

_____

[8] In lieu, the dissent asserts that the "great mass of the people" would, if asked, "surely suppose" that the language of the referendum clause did not mean what the majority understands.  I do not know whether the dissent is right or wrong in this proposition, for it sets forth no evidence in this regard and I am aware of no such evidence.  However, at the very least, the dissent is obligated to demonstrate in regard to its assertion: (a) why it should be assumed that the "great mass of the people" did not understand that their words would be taken seriously and accorded their common understanding; and (b) why a substantial majority of the people's representatives in the Legislature, the overwhelming number of whom had just been reelected and who had been fully apprised by opponents of 2000 PA 381 of the latter's views on the impropriety of attaching an appropriations provision to this measure, cannot be assumed to have been representing the actual sentiments of the "great mass of the people."

referendum provision that it prefers.[9]

### III. JUSTICE WEAVER'S DISSENT

Concerning the dissent of Justice Weaver in this matter, I offer the following thoughts:

(1) The dissent asserts that *Detroit Auto Club* stands for the proposition that only appropriations that "enable the state to exercise its various functions free from financial embarrassment," or without which state agencies would "cease to function," are excepted from the referendum process. However, *Detroit Auto Club*, does not say this at all; rather, it merely stands for the proposition that the Michigan Highway Department is a "state institution." It does not even purport to address the issue of what constitutes "acts making appropriations." Of course, even if the decision *had* said what the dissent asserts, no decision of this Court can permanently transform the plain language of the constitution.

(2) The dissent asserts that "the majority fails to recognize the importance of the referendum, and this Court's responsibility to protect the people's power of the referendum, derived from the constitution . . . ." However, a better characterization of this Court's "responsibility," in my judgment, is that we have a responsibility to protect the people's power of referendum as set forth by the constitution,

---

[9] The dissent is harsh in its characterization of the Legislature's "legerdemain" in attaching an appropriations provision to 2000 PA 381. Possibly, this is a deserved characterization. But, any such skills in this regard by the Legislature can hardly compare to the "legerdemain" (or, indeed, the alchemy) on the part of the dissent in transforming an otherwise clear and straightforward statement of law into something of altogether different meaning.

11

*and* we have a responsibility to protect the people's power of representative self-government as set forth by the constitution. Indeed, the principal "responsibility" of this Court is to read the language of the constitution faithfully. If the people wish to modify their constitution, they may do so under the terms of article 12, and the majority will attempt to interpret the modified constitution faithfully. But the majority will not act as a continuing constitutional convention and dilute the people's right to have their supreme law mean what it says.

## IV. JUSTICE KELLY'S DISSENT

Concerning the dissent of Justice Kelly in this matter, I offer the following thoughts:

(1) The dissent contends that the majority "ignores" the meaning of the word "for" as used in the constitutional provision "acts making appropriations for state institutions." I respectfully disagree. The relevant meaning of "for" in the instant context is "intended to belong to."[10] Clearly, in this case, the appropriation was "intended to belong to" the Department of State Police. Demonstrating that no word is too straightforward not to be transmuted beyond recognition, the dissent manages to conclude that what the framers and the people meant by using the word "for" was that only "appropriations aimed at satisfying the purpose or reason for which a state institution exists" are excepted from the referendum process. The premise of this interpretation

_____

[10] Random House Webster's College Dictionary (1991) at 519.

12

appears to be that there is a meaningful distinction between an agency *qua* agency, and the functions that are performed by such agency, i.e., that there is some disembodied assemblage of functions that are carried out by an agency that define its "essence" or "core" as distinct from the total array of functions that it is charged by the law with carrying out. This is plainly without any basis. If the Legislature determined tomorrow that the Department of State Police should, in addition to its current responsibilities, be assigned new responsibilities now belonging to the Department of Corrections, monies appropriated for such new responsibilities would be every bit as much "for" the Department of State Police as monies appropriated "for" its current responsibilities. I am aware of no textual or other basis for understanding "for" to mean anything at all different in these circumstances.

(2) The dissent accurately asserts that "[w]e start by examining the provision's plain meaning as understood by its ratifiers at the time of its adoption." I agree with that statement and I believe that this is exactly what the majority has done. The dissent has failed to produce a scintilla of evidence to demonstrate that the people of this state in 1963 understood the language "acts making appropriations for state institutions" to mean anything other than what it plainly says.

(3) Because the dissent is unable to produce evidence to contradict the idea that the people intended their constitution to mean what its words convey, in the end, it

13

also relies upon such amorphous concepts as "the fundamental purpose of the general power of referendum" to justify its interpretation of the law. However, there is no "general power" of referendum in Michigan, but only a specific power of referendum as defined by the constitution. And whatever "fundamental purpose" can be discerned to the referendum power, such a purpose must be subordinate to the "fundamental purpose" of a constitution itself, which is that it establishes the ground rules for a system of self-government, and its words, where plain, must be taken seriously.

## V. Final Query For The Dissenters

Finally, I would address the following question to each of my dissenting colleagues: Had those who proposed and ratified our constitution truly intended to limit the referendum power as the majority interprets it, how should they, how could they, have fashioned it any more clearly than they did in article 2, § 9? That is, what words should they have used that they did not? [11]

## VI. Conclusion

I respectfully believe that the Court of Appeals and my dissenting colleagues, by transforming the plain meaning of the words of the constitution, would engage the judiciary in an exercise far beyond its competence and authority. While I can certainly understand the frustrations of those who

---

[11] In this regard, I can recall the member of Congress who, in frustration over a judicial interpretation of a statute that, in his opinion, ignored its plain language, reintroduced the identical statute, but appended at its conclusion, "and we mean it this time!"

14

disapprove of the substance of 2000 PA 381, such frustrations should not be viewed as a justification for giving a meaning to the constitution that is so irreconcilable with its language.[12]

---

[12] In light of the confusion generated, let me make clear, for what it is worth, that I, as a part of the citizenry of Michigan, would also prefer a broader referendum clause in our constitution, one less susceptible to avoidance by appropriations of the type contained in 2000 PA 381. However, until such a referendum clause is adopted by the prescribed constitutional process, see Const 1963, art 12, I will continue to interpret, as best as I can, the referendum clause that has actually been ratified by the people. Furthermore, let me make clear that I am not oblivious to the debate over the motives of the Legislature in attaching the instant appropriations to 2000 PA 381. However, for the reasons set forth in Chief Justice Corrigan's concurring opinion, I simply do not believe that such motives are relevant to our constitutional analysis.

# STATE OF MICHIGAN

## SUPREME COURT

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                              No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

This case presents issues involving the Legislature's constitutional authority and the authority of the people of Michigan—expressly reserved in our 1963 constitution—to vote on matters of great public significance. The statute in this case affects just such an issue of great public significance, involving the delicate balance between the free exercise of Second Amendment rights and the fundamental obligation of government to protect its citizens' physical safety.

Understandably, this case has energized opposing groups of citizens to a degree rarely seen in public debate.[1]

Similarly, this case has energized this Court, prompting each justice to offer an opinion. I join in and agree with the reasoning offered in the dissenting opinions by Justice KELLY and Justice WEAVER. However, I offer this opinion to address my specific concerns with the majority's decision.

The facts, which the actual majority opinion has neglected to recite to either explain its opinion or to serve future litigants as precedent, and which appear only in the seriatim concurrences, are not in dispute. For many years, Michigan has restricted citizens' rights to carry concealed weapons. To obtain a permit to carry a concealed weapon from a county concealed weapons board, a person has needed to demonstrate "proper reasons" to carry a concealed weapon. See

---

[1] The many concerned citizens on both sides defy easy description. To oversimplify, the background dispute over the place of weapons in our society pits firearm advocates and persons interested in hunting against a coalition of law enforcement, religious, and educational interests.

In his concurrence, Justice YOUNG characterizes my observations as a "generous" statement of my own "extensive personal views" of the "political issue" underlying this case. Slip op at 2 (YOUNG, J., concurring). While he is certainly correct that this "political issue" is not before the Court, his conclusion that I have somehow aired my views of the matter is baffling. This dissent merely states that the underlying matter, which led to the referendum drive, is significant and that thoughtful people may disagree about it. If that is a "generous" statement of my "extensive personal views," then apparently Justice YOUNG is equally copious about the matter, see *id.,* and one can only wonder what Justice YOUNG would conclude about Justice MARKMAN's generosity. See slip op at 6-7 (MARKMAN, J., concurring) ("For what it is worth, I am in complete agreement that 2000 PA 381 is a matter of 'great public significance' and can easily appreciate why its opponents wish to make it the subject of a referendum").

2

MCL 28.426, repealed by 2000 PA 381.  Under the former system, the popular perception was that the permits were difficult to obtain.

Proposed legislation to change this system was introduced in the 90th Legislature, but it had few prospects for approval.  However, a legislative majority discovered new prospects after the November 2000 election, when the Legislature reconvened to conduct its biennial "lame duck" session.[2]  In 2000 PA 381, the Legislature adopted what is popularly known as "shall issue" legislation, providing that county boards must issue concealed weapons permits to applicants when certain unremarkable conditions are met.  See MCL 28.425b(7).

Despite the timing of its passage, this profound change in Michigan law did not go unnoticed.  Opposition quickly formed, but to no immediate avail.  However, opponents of the new law realized the great public interest in this measure, and the likelihood that Michigan citizens on both sides of the issue would want to make their views known.  Therefore, opponents began publicly to discuss invoking the referendum process that the people of Michigan reserved for themselves in Const 1963, art 2, § 9.

In that constitutional provision, the people kept the right to vote on laws enacted by the Legislature.  The people of Michigan have long reserved this right, first providing for it in Michigan's 1908 Constitution.  See Const 1908, art 5,

---

[2] Because of its timing, the lame duck session is understood to be a period of diminished public accountability. See, e.g., Farber & Frickey, *Public choice revisited,* 96 Mich L R 1715, 1729 (1998).

3

§ 1. Recent examples of the people exercising this right occurred with the controversial legislation discussed in *Doe v Dep't of Social Services,* 439 Mich 650, 658; 487 NW2d 166 (1992), and with the measures discussed in *Bingo Coalition for Charity—Not Politics v Bd of State Canvassers,* 215 Mich App 405; 546 NW2d 637 (1996).

The referendum power is not unlimited, however. The framers of the Constitution—and the people of Michigan when they ratified the constitution—wisely limited the referendum power so that it would not "extend to acts making appropriations for state institutions . . .," Const 1963, art 2, § 9. For obvious reasons, the state's fulfillment of its financial obligations cannot be subject to the delay and uncertainty inherent in the referendum process. Indeed, as this Court has stated, the limitation is designed to "enable the State to exercise its various functions free from financial embarrassment." *Detroit Auto Club v Secretary of State,* 230 Mich 623, 625; 203 NW 529 (1925).

The concealed weapons legislation that is the subject of this suit acquired, late in the enactment process, some language that provided for a $1 million grant to the Michigan State Police. See MCL 28.425w. Intervening defendant People Who Care About Kids seeks to establish that the monetary provision of 2000 PA 381 will have no effect on the state's ability to function normally, and is not necessary to save the state from financial embarrassment. Rather, intervening defendant suggests that the monetary provision of the act was added specifically to evade the people's right to review the

4

wisdom of the concealed weapons provisions in that act.[3]  That is, intervening defendant states that although 2000 PA 381 will fundamentally change Michigan law governing concealed weapons permits, a legislative majority acted with the specific intent to deny Michigan citizens their right to decide whether most people should be legally allowed to carry concealed firearms.

In answering this argument, the majority focuses narrowly on the superficially straightforward question whether 2000 PA 381 fits within the phrase "acts making appropriations for state institutions."  Slip op at 2.  As the reader has seen, the majority has no problem answering that question affirmatively, granting the lame-duck legislative majority the prize it apparently sought: freedom to change the concealed weapons law without public review through the referendum process.

Despite the legalistic temptation to focus on the

---

[3]  Various Michigan legislators would agree with intervening defendant.  For example, protesting the new law, Senator Byrum stated that "we know that the only reason there was an appropriation . . . was to block the referendum, block the people's right to disagree with the action of their Legislature," 2000 Journal of the Senate 2125, and Senator Gast said that the appropriation "was put in to make it bulletproof and ballot-proof, and I think it's kind of deceptive." White, *Lawyers, guns and money: weapons petitions go to court,* Grand Rapids Press, June 10, 2001, at A18.  Similarly, Representative Wojno stated that "the reason that the proponents of this legislation added this appropriation . . . is inappropriate and insidious.  They apparently believe that in doing so they can circumvent Article II, Section 9 of the Michigan Constitution, and silence the voices of the majority of the people of this State," while Representative Jellema added that the eleventh-hour addition of the appropriation "further diminishes the right of voters to express their views on this very important issue."  2000 Journal of the House 2682, 2683.

5

seemingly literal language of a single phrase in a single sentence, the pertinent sentence here is but one sentence in our state Constitution. Constitutional analysis must not be overly literal; it is an undertaking that must be approached in an entirely different light. Long ago, Michigan's great constitutional scholar Justice Cooley set forth for his many successors on this Court the primary rule of constitutional interpretation, the rule of "common understanding," described in his treatise *Constitutional Limitations,* p 81, to which this Court has turned so frequently. This Court gave a fully developed explanation of the rule in *Traverse City Sch Dist v Attorney Gen,* 384 Mich 390, 405-406; 185 NW2d 9 (1971):

> This case requires the construction of a constitution, where the technical rules of statutory construction do not apply. *McCulloch v Maryland,* 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819).

> The primary rule is the rule of "common understanding" described by Justice Cooley:

> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed it, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abtruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81.) (Emphasis added.)"

> * * *

> A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point

6

this Court has said the following:

> "In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished. *Kearney v Board of State Auditors,* [189 Mich 666, 673; 155 NW 510 (1915)]."

> A third rule is that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does. Chief Justice Marshall pursued this thought fully in *Marbury v Madison,* [5 US (1 Cranch) 137, 175; 2 L Ed 60 (1803)], which we quote in part:

> "If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction . . . ."

These are the principles we must apply when interpreting our state constitution.

The first and second principles stated in *Traverse City Sch Dist* greatly help in answering the question presented in this case. Under those rules, we are to set aside the "technical rules of statutory construction" and the quest for "dark or abtruse meaning" in favor of the interpretation that "reasonable minds, the great mass of the people themselves," would give the state constitution. Without question, that exercise must be carried out in light of the whole document. Further, it must involve a generous reading of the people's will, freed of a lawyer's instinct toward pinched constructions of narrow phrases.

When considered as a whole, the constitution provides various explanations of, and restrictions on, the legislative process. A broad examination of the provisions of article 4 evidences that the framers and the people placed an extremely high value on the integrity and accountability of this

7

process.  There, the Constitution prohibits the Legislature from playing deceptive games in the course of enacting legislation,[4] and further seeks to assure that legislation is given meaningful consideration before it is adopted.[5]  Article 4 also notes the special nature of appropriations bills.[6]

---

[4] Const 1963, art 4, §§ 24 and 25, provides this protection, stating:

> No law shall embrace more than one object, which shall be expressed in its title.  No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.

> No law shall be revised, altered or amended by reference to its title only.  The section or sections of the act altered or amended shall be re-enacted and published at length.

[5] Const 1963, art 4, § 26, provides this assurance, stating:

> No bill shall be passed or become a law at any regular session of the legislature until it has been printed or reproduced and in the possession of each house for at least five days.  Every bill shall be read three times in each house before the final passage thereof.  No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house.  On the final passage of bills, the votes and names of members voting thereon shall be entered in the journal.

[6] This is Const 1963, art 4, § 31, which provides:

> The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year's operation.  Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill.  One of the general appropriation bills as passed by the legislature shall contain an itemized statement of

(continued...)

8

Finally, the reserved role of the people is noted in article 4,[7] as well as in other provisions of the Constitution. See Const 1963, art 2, § 9; art 12, § 2.

In light of these provisions and the overall approach to legislation taken by the constitution's framers and the people who ratified it, I am convinced that the Court of Appeals correctly decided this case. I am confident that the constitutional right of referendum, in this narrow context, should not be taken away by so transparent an artifice. Justice COOLEY's "great mass of the people" would, if asked, surely suppose that "acts making appropriations for state institutions," which deny the people's reserved power of referendum, are general appropriations bills containing substantial grants to state agencies. Those grants would have to ensure the viability of the agencies or, as the Court of Appeals put it, support the agencies' "core functions." 246 Mich App ___; ___ NW2d ___ (2001). The people of Michigan, I am certain, never intended to authorize the 2000 lame duck Legislature's legerdemain.

---

[6](...continued)
estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed.

[7] Article 4, concerning the legislative branch, notes the people's power:

> Any bill passed by the legislature and approved by the governor, except a bill appropriating money, may provide that it will not become law unless approved by a majority of the electors voting thereon. [Const 1963, art 4, § 34.]

9

Additionally, the third principle stated in *Traverse City Sch Dist* provides further support for this conclusion. That principle is that when possible, we must prefer an interpretation that does not create a constitutional invalidity over an interpretation that does.[8] The referendum power, of course, is the people's reserved check on the Legislature. In *Kuhn v Dep't of Treasury,* 384 Mich 378, 385, n 10; 183 NW2d 796 (1971), this Court, ironically, referred to the referendum power as a "gun-behind-the-door to be taken up

---

[8] The Court cited *Marbury v Madison* in support of this principle. See *Traverse City Sch Dist, supra* at 406. Although *Marbury* is sometimes cited for the proposition that the construction of a statute that creates a constitutional invalidity is disfavored, see, e.g., *Council of Orgs & Others for Ed About Parochiaid v Governor,* 455 Mich 557, 570; 566 NW2d 208 (1997), in the passage this Court cited, Chief Justice Marshall actually was addressing invalidating constitutional provisions. *Council of Orgs,* as well as *Traverse City Sch Dist, supra* at 406, and *House Speaker v Governor,* 443 Mich 560, 585; 506 NW2d 190 (1993), quoted this passage from *Marbury*:

> If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, and for adhering to the obvious meaning. [*Id.* at 175.]

The "clause" referenced, though, was a clause of the United States Constitution, as illustrated by the United States Supreme Court's language preceding the quoted passage:

> It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is admissible, unless the words require it. [*Id.* at 174.]

*Marbury* then discussed how US Const, art 3, § 2, ¶ 2 provided for the Supreme Court's jurisdiction, and how no construction of any clause in that section that rendered any other clause inoperative would be favored. See *Marbury, supra* at 175-180. *Traverse City Sch Dist* also dealt with giving meaning to the language of the constitution, not saving a statute from constitutional invalidity. See *Traverse City Sch Dist, supra* at 412-413. Likewise, in this case we must give meaning to, and not invalidate, the people's reserved referendum power.

10

on those occasions when the legislature itself does not respond to popular demands." However, with its decision in this case, the majority removes the people's check, taking the gun from behind the door and handing it to the Legislature. By holding that the money inserted into 2000 PA 381 circumvents the people's reserved referendum power, the majority holds that the referendum power exists at the Legislature's pleasure. Whenever the Legislature wants to avoid the people's check on its power, it need only insert some money into a bill, apparently even a de minimis amount, to get around that power. The people's check on the Legislature will thus become invalid because the people will only have the "gun-behind-the-door" when the Legislature gives it to them. Such an interpretation is certainly at odds with this Court's commitment to liberally construe constitutional provisions reserving for the people a direct legislative voice, see *Kuhn, supra* at 385, but further leaves the people's reserved referendum power, in a word, useless.

In its short opinion, the majority cites "an unbroken line of decisions of this Court interpreting [the referendum power]." Slip op at 2. The line is unbroken because it reflects this Court's dual commitments to the people's right to vote on matters of great public significance and to the taxpayers' right to a state government that maintains responsible and functional taxation and appropriation policies. At times, the latter commitment has required that we give effect to the constitutional insulation against referring appropriations measures and related financial

11

enactments.  Never, though, has the "unbroken line" veered in the direction approved in this case.

Also, I find it as inevitable as night following day that the concurrences would characterize the lengthy, thoughtful majority opinion as "admirably concise," slip op at 1 (YOUNG, J., concurring), and as setting "forth its analysis simply and straightforwardly" and doing so because "the constitutional issue before us is simple and straightforward." Slip op at 1-2 (MARKMAN, J., concurring).  Yet, as self-evident as the majority believes its result to be, the orchestrated, explanatory concurrences appeared following this dissent.  In my view, these serial apologias do nothing to alter the majority's disembowelment of the public's constitutionally guaranteed right to referendum.

So, despite the constitutional structure and the people's desire for a check on the Legislature, the majority concludes that the Legislature can decide when the people will have that check.  I reiterate that reasonable minds may differ about the underlying substance of this case.  Some say public safety and ordinary social intercourse will be disturbed by a radical switch in state concealed weapons policy, while others say that public safety will be enhanced when responsible citizens can carry weapons.  I say, and do not believe reasonable minds can dispute, that the constitution says that the people must be allowed to vote.

KELLY, J., concurred with CAVANAGH, J.

12

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBECK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                                  No.  119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.

_____

WEAVER, J. (*dissenting*).

    I respectfully dissent from the majority's holding that 2000 Public Act 381 is exempt from the power of referendum of the Michigan Constitution.

    Art 2, § 9 of the 1963 Michigan Constitution  states that "[t]he power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds . . . ."  This language was taken almost

verbatim[1] from the 1908 Michigan Constitution, art 5, § 1 (amendment of 1913), which read:

> The legislative power of the state of Michigan is vested in a senate and house of representatives; but the people reserve to themselves the power to propose legislative measures, resolutions and laws; to enact or reject the same at the polls independently of the Legislature; and to approve or reject at the polls any act passed by the Legislature, except *acts making appropriations for state institutions and to meet deficiencies in state funds*." [Emphasis added.]

The sole interpretation of the "acts making appropriations for state institutions" language of art 5, § 1 of the 1908 Constitution is found in the 1925 Michigan Supreme Court case, *Detroit Automobile Club* v *Secretary of State*, 230 Mich 623; 203 NW 529 (1925).

In *Detroit Automobile Club,* plaintiffs sought a writ of mandamus to compel the defendant to refrain from immediately enforcing 1925 PA 2 in order to allow a referendum on the law. The act at issue in *Detroit Automobile Club* appropriated money for the use of the Highway Department in constructing and maintaining the highways of the state. To determine whether the Legislature had the power to give the act immediate effect, and thus preclude a referendum, *Detroit Automobile Club* addressed the meaning of art 5, § 21[2] and art 5, § 1.

---

[1] In 1974 this Court held that "The referendary provision and exceptions of the 1908 Constitution were retained in the 1963 Constitution as art 2, § 9 *without change in the pertinent language.*" *Bds of Co Rd Comm's v Bd of State Canvassers*, 391 Mich 666, 674-675; 218 NW2d 144 (1974) (emphasis added).

[2] Art 5, § 21 provided in pertinent part:

> No act shall take effect or be in force until
> (continued...)

2

*Detroit Automobile Club* first addressed whether the Highway Department was a state institution within the meaning of art 5, § 1. Ultimately, the Court held that the Highway Department was a state institution within the meaning of the constitution. *Detroit Automobile Club, supra* at 626. In order to reach this holding, the Court ruled:

> The question is not solely whether the highway department may be correctly termed a state institution, but rather whether, in view of the functions which it exercises, it comes within the meaning of that term as used in the Constitution. *It is not difficult to determine what the framers of the Constitution had in mind. It is clear that, by permitting immediate effect to be given to appropriation acts for state institutions, it was their purpose to enable the state to exercise its various functions free from financial embarrassment.* The highway department exercises state functions. It was created by the Legislature for that purpose. It must have money to carry on its activities. *Without the money appropriated by this act for its immediate use, it would cease to function. The constitutional purpose was to prevent such a contingency.* [*Id.*, 625-626 (emphasis added).]

The Court viewed the purpose of the Legislature's power to give an act of appropriation immediate effect as one necessary to permit the "state to exercise its various functions free from financial embarrassment" and to allow for state institutions to carry on state functions. *Id.* To that Court, this purpose of the framers was "not difficult to determine . . . ." *Id. Detroit Automobile Club* recognized the

---

[2](...continued)
the expiration of ninety days from the end of the session at which the same is passed, except that the legislature may give immediate effect to acts making appropriations and acts immediately necessary for the preservation of the public peace, health or safety by a 2/3 vote of the members of each elected house.

necessity of immediacy *under these circumstances* and it is *under these circumstances* that *Detroit Automobile Club* determined that an act was not subject to the people's referendum power.

This Court reaffirmed its articulation of the purpose of the constitutional provision in *Moreton v Secretary of State,* 240 Mich 584, 592; 216 NW 450 (1927), where it declined to interpret the provision in a way which would "defeat the constitutional purpose, which is to save the State from financial embarrassment in exercising any of its State functions." Further, this Court has cited *Detroit Automobile Club's* interpretation of this language without question or criticism in *Co Rd Ass'n of Michigan v Bd of State Canvassers,* 407 Mich 101, 112-113; 282 NW2d 774 (1979), and *Michigan Good Roads Fed v Bd of State Canvassers,* 333 Mich 352, 356-357; 53 NW2d 481 (1952).[3]

When the framers of the 1963 Constitution included the language on "acts making appropriations for state institutions," and the people approved it, it was with the knowledge of how this Court had previously interpreted this same language in *Detroit Automobile Club*. It is a well-established rule of constitutional construction that "[t]he framers of a Constitution are presumed to have a knowledge of

---

[3] The 1939 decision in *Todd v Hull,* 288 Mich 521; 285 NW 46 (1939), did briefly discuss art 5, § 1 of the 1908 Constitution (the predecessor to Const 1963, art 2, § 9), although *Todd's* primary focus was on whether 1939 PA 3 was immediately necessary for the preservation of the public peace, health, or safety within the contemplation of art 5, § 21, of the 1908 Constitution. Moreover, this case was a four to four split decision, and has no precedential effect.

existing laws,...and to act in reference to that knowledge . . . ." *People v May,* 3 Mich 598, 610 (1855). See also, *Detroit v Chapin*, 108 Mich 136, 142; 66 NW 587 (1895); *Richardson v Secretary of State*, 381 Mich 304, 311-313; 160 NW 2d 883 (1968); *Bds of Co Rd Comm's v Bd of State Canvassers*, 391 Mich 666, 675; 218 NW2d 144 (1974).[4] Indeed, in reviewing "[t]he construction placed by this Court on this exception to the right of referendum in the 1925 *Detroit Automobile Club*, 1927 *Moreton*, and 1952 *Good Roads* cases," this Court noted:

> The delegates to the 1961 Constitutional Convention are presumed to have known and to have understood the meaning ascribed in these earlier decisions to the language of the 1908 Constitution. This language was retained by them in the 1963 Constitution without modification in response to the earlier decisions. Under well-established principles, it is not open to us to place a new construction on this language. [*Bds of Co Rd Comm's, supra* at 676.]

Because the reasoning in *Detroit Automobile Club* was the sole and uncontradicted interpretation of "acts making appropriations for state institutions," I believe that its reasoning is the best evidence of the framers understanding of this language and perhaps the explanation why there is so little discussion of its meaning in the record of the convention.

Applying *Detroit Auto Club* to the facts of this case, the money appropriated in 2001 PA 381 is not necessary for the

---

[4]Notably, in *Advisory Opinion re Constitutionality of 1973 PA 1 and 2*, 390 Mich 166, 176-177; 211 NW2d 28 (1973), we stated that a judicially created exception to a constitutional limitation of state indebtedness survived the ratification of the 1963 Constitution because, "whatever the logic," the people were "presumably aware of the exception and did not eliminate it."

State Police to "exercise its various functions free from financial embarrassment," but rather is necessary only to implement the act itself. *Detroit Automobile Club, supra* at 625-626. The State Police would not cease to function without the appropriation. The effect of referendum on 2001 PA 381 on the functioning of the State Police stands in contrast to the concerns of the Court in the "gas tax cases." *Moreton, supra; Good Roads, supra;* and *Co Rd Ass'n of Michigan, supra.* In the "gas tax cases," the Court concluded that the building of good roads is an important state function. Further, the Court concluded the appropriations at issue in the "gas tax cases" were made to "enable it to function in that regard, and, being made for that purpose, . . . are not subject to referendum." *Moreton, supra* at 592.[5]

Further, I believe that the majority fails to recognize the importance of the referendum, and this Court's responsibility to protect the people's power of the referendum, as derived from the constitution and as outlined in *Michigan Farm Bureau v Hare,* 379 Mich 387, 393; 151 NW2d 797 (1967):

> There is nevertheless an overriding rule of constitutional construction which requires that the commonly understood referral process, forming as it does a specific power the people themselves have expressly reserved, be saved if possible as against conceivable if not likely evasion or parry by the legislature. The rule is, in substance, that no court should construe a clause or section of a constitution as to impede or defeat its generally

---

[5] Thus, I agree with Justice Kelly that the gas tax cases do not support the majority conclusion, but, rather, are consistent with my position and that of my dissenting colleagues. See slip op at 6-7.

6

understood ends when another construction thereof, equally concordant with the words and sense of that clause or section, will guard and enforce these ends.

Given the prior, uncontradicted, and equally concordant construction in *Detroit Automobile Club*, I believe we are precluded in this case from applying the constitutional provision in a way that would take the power of the referendum away from the people and give it to the Legislature.[6]

Under the majority's opinion, if the Legislature were to drop the six zeros on the appropriation in 2000 PA 381, leaving an appropriation of $1 to the State Police, the act would nevertheless remain referendum-proof. I cannot believe that this outcome is the interpretation that "reasonable minds, the great mass of the people themselves, would give it." *Traverse City Sch Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley's Const Lim 81. I agree with Justice Cavanagh that by determining that the inclusion of a monetary provision in 2000 PA 381 circumvents the people's reserved referendum power, the majority effectively holds "that the referendum power exists at the Legislature's pleasure." Slip op at 11.

Finally, it is essential to recognize that the issue before us is one of constitutional interpretation. My opinion

---

[6] Such considerations are relevant even though this Court has recently rejected the "absurd result" mode of statutory construction. *People v McIntire*, 461 Mich 147, 155-160; 599 NW2d 102 (1999). *McIntire* concerned a matter of *statutory* construction. We have long recognized that "[c]onstruction of a constitution is a special situation where technical rules of statutory construction do not apply." *Highway Comm v Vanderloot,* 392 Mich 159, 179; 220 NW2d 416 (1974).

7

on the issue of constitutional law in this case does not address and should not be read to reflect one way or the other a position on the merits of the concealed weapons act passed by the Legislature.

I would affirm the result of the Court of Appeals.

MICHIGAN UNITED CONSERVATION
CLUBS, MICHIGAN COALITION FOR
RESPONSIBLE GUN OWNERS, ROSS
DYKMAN, DAVID K. FELBEK, and
CORRIE WILLIAMS,

    Plaintiffs-Appellants,

v                                No. 119274

SECRETARY OF STATE and STATE
BOARD OF CANVASSERS,

    Defendants-Appellees,

and

PEOPLE WHO CARE ABOUT KIDS,

    Intervening
    Defendant-Appellee.
_____

KELLY, J. (*dissenting*).

    I agree with my two dissenting colleagues that 2000 PA 381 (Act 381) does not constitute an act "making appropriations for state institutions" within the meaning of Const 1963, art 2, § 9. Thus, I would affirm the decision of the Court of Appeals and hold the act subject to referendum. I write separately, however, to make several points.

### I. The Constitutional Meaning of "Acts Making Appropriations For State Institutions"

    In Const 1963, art 2, § 9, the people reserved the power of referendum. They limited it, saying it "does not extend to acts making appropriations for state institutions . . . ." The question in the present case is whether a referendum of

Act 381 is possible, because the act makes "appropriations for state institutions."

When construing provisions of our constitution, this Court uses the rule of "common understanding." See *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000); *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75, 84; 594 NW2d 491 (1999). The rule requires "ascertain[ing] as best the Court may the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions . . . ." *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 390-391; 151 NW2d 797 (1967); *Traverse City Sch Dist v Attorney Gen*, 384 Mich 390, 405-406; 185 NW2d 9 (1971).

We start by examining the provision's plain meaning as understood by its ratifiers at the time of its adoption. See *American Axle & Mfg, Inc*, *supra* at 362.  Article 2, § 9 provides:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

In deciding this case, the majority makes much of the

2

fact that Act 381 allocates $1,000,000 "to the department of state police . . . ." Slip op at 2. It concludes that the $1,000,000 is an "appropriation" and that the Department of State Police is a "state institution." See slip op at 2. Thus, it reasons, the power of referendum does not extend to Act 381. I disagree.

The majority's error, in my view, arises in part because it fails to examine carefully the meaning of the phrase "acts making appropriations for state institutions." In particular, it ignores the use of the word "for" in that phrase. In essence, it interprets art 2, § 9 to exempt from referendum any act that makes an appropriation "to" a state institution. This interpretation not only lacks support from the plain language of the article, it fails to appreciate the critical difference between the meanings of "to"[1] and "for."

I would interpret art 2, § 9 to give effect to the words contained in it. The provision indicates that an act making an appropriation is exempt from referendum only if the appropriation is made "for" state institutions. The dictionary definition of "for," in pertinent part, is "suiting the purposes or needs of," "with the object or purpose of."[2] "Purpose" is defined as "the reason for which something

---

[1]"To" is defined, inter alia, as "used for expressing destination or appointed end." Random House Webster's College Dictionary, p 1401 (1995).

[2]*Id*. at 519. My use of the word "for" is not as Justice Markman asserts, "transmuted beyond recognition." The meaning is straight out of the dictionary.

3

exists."[3] Thus, a reasonable interpretation of art 2, § 9 is that legislation that contains an appropriation aimed at satisfying the purpose or reason for which a state institution exists is referendum-proof. Unless the appropriation is intended to support the core function of a state institution, it does not prevent the people from voting on the legislation in referendum.

I would adopt this as the most reasonable interpretation of art 2, § 9.[4] Applying it to this case, I would conclude that Act 381 does not make an appropriation for a state institution." Of the $1,000,000 that it allocates to the Department of State Police not a penny serves the central function for which the department exists. Instead, the appropriation implements the specific substantive provisions of the act.[5] None of items funded relates to a core function of the state police department.[6] Thus, giving the words of art

---

[3]*Id.* at 1096.

[4]In his concurring opinion, Justice Markman makes a "final query for the dissenters": How could those who ratified the constitution have fashioned the words of art 2, § 9 more clearly? My response is that no wording change is needed. Art 2, § 9 means what it says. However, it would have to be reworded to accurately convey the meaning that Justice Markman and the majority give it. It would have to be changed to read: The power of referendum "does not extend to acts making appropriations *to* state institutions . . . ."

[5]Act 381 directs that the $1,000,000 be used, inter alia, to distribute trigger locks, provide permit application kits, take photographs of applicants, conduct a public safety campaign regarding Act 381's requirements, and conduct fingerprint analysis and comparison reports required under the Act.

[6]Although Justice Young opines that the judiciary is ill-equipped to resolve what a state institution's "core function"
(continued...)

4

2, § 9 and of Act 381 their plain meaning, the Act does not make appropriations "for state institutions" within the meaning of the constitution.[7]

My interpretation is consistent with this Court's mandate that the right of referendum should be liberally construed. See, e.g., *Kuhn v Dep't of Treasury*, 384 Mich 378, 385; 183 NW2d 796 (1971). Furthermore, it prevents the Legislature from easily circumventing the people's constitutional referendum power. With that end in mind, I agree with the views expressed by the Arizona Supreme Court in *Warner v Secretary of State*:[8]

> To hold that an act may not be referred because incidentally it provides the funds to accomplish the ends it seeks would have the effect of practically nullifying the referendum provision of the Constitution, because many of the measures passed carry appropriations of this character, and it would be an easy matter to include such a provision in others and bring about the same result.

II. The Majority's Unprecedented Interpretation of Art 2, §
    9: A Departure From Decisions In The "Gas Tax" Cases[9]

---

[6](...continued)
is, see slip op at 32, I have every confidence in the judiciary's capabilities in this regard.

[7]Justice Markman creates a hypothetical example whereby the Legislature enacts a law that assigns to the Department of State Police responsibilities belonging to the Department of Corrections, and then allocates money to that end. See Justice Markman's slip op at 16. I find his hypothetical example inapplicable. Act 381 does not transfer functions belonging to any other agency.

[8]39 Ariz 203, 215-216; 4 P2d 1000 (1931).

[9]*Detroit Automobile Club v Secretary of State*, 230 Mich 623; 203 NW 529 (1925); *Moreton v Secretary of State*, 240 Mich 584, 592; 216 NW 450 (1927); *Good Rds Fed v Bd of State Canvassers*, 333 Mich 352, 360; 53 NW2d 481 (1952); *Co Rd Comm'rs v Bd of State Canvassers*, 391 Mich 666; 218 NW2d 144 (1974); *Co Rd Ass'n of Michigan v Bd of State Canvassers*, 407
(continued...)

The majority asserts that its conclusion, that Act 381 makes appropriations for state institutions, is consistent with "an unbroken line of decisions from this Court" in the gas tax cases. See slip op at 2. Upon close inspection, one finds the assertion untrue. Rather, as will be seen, it is my interpretation, and that of my two dissenting colleagues, that is consistent with the gas tax cases.

To be sure, the gas tax cases are "unbroken" in the sense that all constitute proclamations from this Court that the challenged gas tax was nonreferable, meaning that it could not be subject to a referendum vote. Notwithstanding, they do not support the majority's conclusion.

In the earliest gas tax case, this Court stated that the appropriation exception in our constitution was intended to allow the state to exercise its various core functions free from financial embarrassment. See *Detroit Automobile Club v Secretary of State*, 230 Mich 623, 625; 203 NW 529 (1925). We explained:

> It is clear that, *by permitting immediate effect to be given to appropriation acts for state institutions, it was their purpose to enable the state to exercise its various functions free from financial embarrassment.* The highway department exercises state functions. It was created by the Legislature for that purpose. It must have money to carry on its activities. *Without the money appropriated by this act for its immediate use, it would cease to function. The constitutional purpose was to prevent such a contingency.* [*Id.* at 625-626 (emphasis added).][10]

---

[9](...continued)
Mich 101, 116-118; 282 NW2d 774 (1979).

[10]In *Detroit Automobile Club*, the issue was whether 1925
(continued...)

This interpretation was reiterated in the second gas tax case. See *Moreton v Secretary of State*, 240 Mich 584, 592; 216 NW 450 (1927). *Moreton* stated that an act that contained appropriations to enable state agencies "to function" was nonreferable. *Detroit Automobile Club* and *Moreton* contain the most thorough discussion of this Court's interpretation of the appropriation exception to the referendum power.[11] These cases demonstrate that the appropriation exception within art 2, § 9, was prompted by a fear of financial embarrassment. That could occur if, by referendum petition, an appropriation for a state institution were suspended pending a vote on a legislative act. See *Moreton, supra* at 592; *Detroit Automobile Club*, *supra* at 625.

The majority's interpretation of art 2, § 9, impliedly

---

[10](...continued)
PA 1 was subject to referendum under Const 1908, Art 5, § 1, amendment of 1913 (the predecessor to Const 1963, art 2, § 9), i.e., whether it made an appropriation "for [a] state institution[]." In his concurring opinion in this case, Justice Markman accurately notes that the portion of *Detroit Automobile Club* quoted above is taken from this Court's discussion regarding the meaning of the term "state institution." Nevertheless, it is clear that that discussion contained, also, an interpretation of the entire referendum exception provision. For this reason, I find the Court's discussion in *Detroit Automobile Club* useful here.

[11]In two of the three later gas tax cases, this Court merely quoted or cited, then followed, our interpretation in *Detroit Automobile Club* of the appropriation exception to the power of referendum. See *Michigan Good Rds Federation*, *supra* at 356-357; *Co Rd Assoc*, *supra* at 112-113. In the other gas tax case, this Court merely cited our holding in *Detroit Automobile Club*. See *Co Rd Comm'rs*, *supra* at 672.

In *Todd v Hull*, 288 Mich 521, 523-524; 285 NW 46 (1939), we discussed the predecessor to art 2, § 9 (Const 1908, art 5, § 1). However, *Todd* was a four to four decision and, therefore, has no precedential effect.

7

rejects this Court's "core function" interpretation of the phrase in our constitution exempting from referendum "acts making appropriations for state institutions."[12] Therefore, its decision is not consistent with our prior decisions, at all. In fact, it seriously departs from them.

Given that *Detroit Automobile Club* represents the only substantive interpretation by this Court of "acts making appropriations for state institutions," I agree with Justice Weaver that we should follow it. Doing so further supports the conclusion I have articulated: art 2, § 9 was intended to exempt from referendum only those acts containing grants that ensure the viability of state agency recipients, or as the Court of Appeals said, that support the agencies' "core functions." 246 Mich App ___; ___ NW2d ___ (2001).

This interpretation renders the referendum exception consistent with the fundamental purpose of the general power of referendum. If the appropriation provision in an act is essential to a core purpose of a state institution, the act may not be referred. The risk is too great that the delay caused by a referendum vote would embarrass government and be detrimental to the public. On the other hand, where the appropriation provision is for a lesser function, not essential to the purpose of the department, the embarrassment problem does not arise. In the latter case, the people's right to decide policy issues for themselves, which is the core

_____

[12]Two of the concurring opinions do so, as well. See Justice Markman's slip op at 2-3; Justice Young's slip op at 12-29.

8

purpose for which the people reserved the referendum power, should survive.

### III. Court Consideration of the Legislature's Motives

In one of the three concurring opinions joining the majority, my colleague "emphasize[s]" that the Legislature's subjective motivation for making a $1,000,000 appropriation in Act 381 "is irrelevant." Chief Justice Corrigan's slip op at 2. In my view, this is an unfortunate exaggeration.

I acknowledge that, as a general rule, courts do not inquire into the motives of the Legislature in passing legislation. See *Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934). However, "[c]ourts are not supposed to be blinded bats." *Todd v Hull*, 288 Mich 521, 543; 285 NW 46 (1939) (opinion of Bushnell, J.), quoting *State ex rel Pollock v Becker*, 289 Mo 660, ___; 233 SW 641, 646 (1921).[13] Hence, I would not be so quick to eliminate categorically the possibility that this Court may consider, where pertinent, relevant, and ascertainable, the Legislature's motives in enacting a statute.

### IV. Referendum v Initiative

I find objectionable, also, the palliation offered by two of my colleagues in the majority that the intervening defendant retains the direct remedy of the initiative process. Chief Justice Corrigan's slip op at 1; Justice Young's slip op at 31. Although I agree that the initiative process is

---

[13]The instant case brings to mind the ancient quotation that "[t]he voice is Jacob's voice but the hands are the hands of Esau." *Todd*, *supra* at 543, (opinion of Bushnell, J.).

9

available here, I find their observation misplaced.

First, any alternative remedy that exists is irrelevant to the issue before us: whether Act 381 constitutes an act "making appropriations for state institutions" within the meaning of art 2, § 9. Moreover, there are real and heightened practical difficulties associated with pursuing an initiative process, as compared with referendum. Not only does the initiative process require far more petition signatures than the referendum process, it also involves much more complicated procedures. Const 1963, art 2, § 9.

Also, this case presents the exact situation for which the referendum power was created. The power exists to permit citizens to suspend or annul laws passed by the Legislature until the people can vote on the merits of the law. See *Alabama Freight v Hunt*, 29 Ariz 419, 424; 242 P2d 658 (1926); see also Const 1963, art 2, § 9. Thus, if Act 381 is referable, it would not become effective until the people voted it should be the law of this state. Const 1963, art 2, § 9.

The power of initiative, on the other hand, is intended to protect against a Legislature that fails to act.[14] It does not suspend the effective date of a law passed by the Legislature. Const 1963, art 2, § 9. Therefore, even if a successful initiative drive were pursued, the people would not

---

[14]See Comment, *Interpretation of initiatives by reference to similar statutes: Canons of construction do not adequately measure voter intent*, 34 Santa Clara L R 945, 973 (1994), "legislative inaction is the reason the initiative process was established."

vote on the law until at least November 2002. By then, Act 381 would have been operative for over sixteen months and potentially thousands of additional concealed weapons would be carried by thousands more Michiganians. Thus, from intervening defendant's perspective, the availability of the initiative process is an unsatisfactory remedy.[15]

## V. Conclusion

For these reasons, and for the reasons given by my two dissenting colleagues, I believe that Act 381 does not constitute "acts making appropriations for state institutions" within the meaning of art 2, § 9. Accordingly, I would affirm the decision of the Court of Appeals.

---

[15]I note, also, that the issue in the instant case is one of constitutional interpretation. Accordingly, my opinion here addresses an issue of constitutional law. It does not address and ought not be construed to address the merits of Act 381.